IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 9, 2024

## STATE OF TENNESSEE v. KAVARIS JAVON BOOKER AND CLIFTON DONNELL CRAIG

**Appeal from the Circuit Court for Maury County**
**Nos. 26672, 26675   Stella L. Hargrove, Judge**

_____

### No. M2022-01329-CCA-R3-CD

_____

Defendant Kavaris Javon Booker and Defendant Clifton Donnell Craig were each charged in separate indictments of first degree premeditated murder (count one), felon in possession of a firearm (count two), and aggravated assault resulting in death (count three).  The trial court granted the State's motion to join the two cases and in a joint trial, a jury convicted Defendant Booker as indicted in count two but convicted him of the lesser-included offense of facilitation of first degree murder in count one and facilitation of aggravated assault in count three.  The jury convicted Defendant Craig of all the indicted charges.  Defendant Booker received an effective seventeen-year sentence; Defendant Craig received a sentence of life imprisonment.  In this consolidated appeal, Defendant Booker claims that the trial court denied him a speedy trial, the trial court erred in denying his motion to sever his case from Defendant Craig, and that the evidence is insufficient to support his conviction for facilitation of first degree murder.  Defendant Craig likewise claims the evidence is insufficient to support his convictions and that the trial court failed to instruct the jury on the weight afforded to circumstantial evidence.  Following our review of the entire record, the briefs of the parties, and applicable authority, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and MATTHEW J. WILSON, J., joined.

Michael D. Cox, Columbia, Tennessee, (at trial and on appeal) for the appellant, Kavaris Javon Booker.

Tammy D. Wendt, Lewisburg, Tennessee (at trial and on appeal), Paul J. Walwyn, Madison, Tennessee (at trial), Samuel Delk Kennedy, Jr. Columbia, Tennessee (pretrial),

and L. Samuel Patterson, Columbia, Tennessee (pretrial), for the appellant, Clifton Donnell Craig.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Brent Cooper, District Attorney General; and Kyle E. Dodd, Pamela Anderson, and Caleb Bayless, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

On May 6, 2018, Derrick Wells was shot multiple times outside a friend's apartment. He did not survive his wounds. Kavaris Javon Booker ("Defendant Booker") and Clifton Donnell Craig ("Defendant Craig") were identified as the assailants.

*Pretrial Proceedings*

On July 5, 2018, the Maury County Grand Jury entered a true bill, indicting Defendant Booker on first degree premeditated murder, felon in possession of a firearm, and aggravated assault resulting in death (case 26672). On the same date, the grand jury entered a true bill charging Defendant Craig with the same three offenses (case 26675).

*Joinder*

On November 16, 2018, the State filed a motion for permissive joinder of the co-defendants under Rule 8(c) of the Tennessee Rules of Criminal Procedure on the grounds that Defendants were each charged with the same offenses which were "closely connected in time, place, and occasion," and that it "would [have been] difficult to separate proof of one charge from proof of the others." Defendant Booker opposed joinder on the grounds that Defendant Craig had made allegedly incriminating statements to his cellmate, Antonio Merritt, that mutually antagonistic defenses were anticipated, and that the "overwhelming evidence" would point to Defendant Craig as the sole perpetrator.

On December 7, 2018, the trial court conducted a hearing on the State's motion for joinder. The State argued that permissive joinder was proper under Rule 8(c) of the Tennessee Rules of Criminal Procedure because Defendants were each charged with the same offenses, with the only variance being that the count two charge of felon in possession of a firearm had differing underlying felonies for each Defendant. The State argued further

- 2 -

that joinder of Defendants did not run afoul of *Bruton*[1] because in Defendants' statements to law enforcement, neither Defendant implicated the other.

Defendant Craig argued that joinder ran afoul of *Bruton* because Defendant Booker gave a lengthy statement stating that he witnessed Defendant Craig and the victim in a "heated argument." Defendant Craig maintained that Defendant Booker placed him at the scene of the shooting, although Defendant Booker did not implicate Defendant Craig in the actual shooting. Defendant Booker agreed with Defendant Craig that joinder would violate *Bruton* because Defendant Craig placed Defendant Booker in a blue vehicle which was connected to the shooting.

The trial court granted the State's motion for permissive joinder finding that "each of the defendants is charged with accountability for each offense included[.]" *See* Tenn. R. Crim. P. 8(c)(1). An order granting the motion was entered on the same day of the hearing, December 7, 2018.

*Severance and Speedy Trial*

On February 28, 2020, Defendant Booker filed his first motion to sever his case from Defendant Craig's under Rule 14(c)(1) of the Tennessee Rules of Criminal Procedure arguing that severance was necessary because Defendant Craig told authorities that Defendant Booker had borrowed Defendant Craig's car, which was seen at the site of the shooting, and that Defendant Booker had given Defendant Craig a handgun which the State would argue was used in the commission of the crimes. He also argued that severance was necessary to protect his right to a speedy trial which would be frustrated given the recent appointment of new counsel for Defendant Craig.

Simultaneous with his motion to sever, Defendant Booker filed a motion for a speedy trial arguing that he had been incarcerated since May 7, 2018, unable to make bond, and that at the filing of the motion, no trial date had been set and the last scheduled trial date of February 2020 had been continued at the State's request.

On March 6, 2020, the trial court conducted a hearing on both of Defendant Booker's motions. Defendant Booker argued that the length of the delay in trying the case was "approaching prejudice" due to the length of his incarceration. He noted that the case had been set for trial three times and that the most recent trial date had been set without knowledge of whether the medical examiner who conducted the victim's autopsy would

---

[1] *See Bruton v. United States*, 391 U.S. 123, 130-37 (1968) (holding that admission at a joint trial of a non-testifying co-defendant's confession implicating the defendant constituted prejudicial error even though the trial court gave an instruction that the confession could only be used against the co-defendant and must be disregarded with respect to the defendant).

be available for trial. Defendant Booker added that Defendant Craig's counsel had "recently left the practice of law" and new counsel had been appointed who would need time to be educated on the case and prepare for trial. Defendant Booker moved for a trial to be set "as soon as practical."

In arguing for a severance, Defendant Booker argued that the length of time in waiting for a trial date, along with Defendant Craig's having new counsel, constituted sufficient grounds to grant his motion to sever to protect Defendant Booker's right to a speedy trial. He also claimed that the motion to sever was warranted because Defendant Craig told law enforcement that Defendant Booker gave him a 9mm caliber handgun and that Defendant Booker possessed "other evidence of the shooting" of which he was trying to dispose. Defendant Booker stated that a *Bruton* violation was "evident" from Defendant Craig's statement about the 9mm caliber gun which Defendant Booker anticipated would be part of the State's theory on the kind of weapon used to kill the victim.

The State agreed with Defendant Booker's request for "a trial date as soon as feasible for the Court." The State explained that Defendant Craig's newly-appointed counsel had initially represented Defendant Craig and was thus "not starting completely fresh" giving the trial court "a greater chance of setting a quicker trial date" than had new counsel been "ignorant of the entire situation[.]" The transcript reflects that Defendant Craig's new counsel was present at the hearing and made no arguments in response to Defendant Booker's motions when asked by the trial court, nor did he disagree about the timeline of his representation of Defendant Craig. The State explained that the Tennessee Bureau of Investigation ("TBI") had not yet completed its testing of ballistics and gunshot residue evidence. The State explained further that its hands were tied in terms of the medical examiner who had been previously unavailable "twice."

In response to Defendant Booker's motion to sever, the State maintained that Defendants should remained joined. The State recognized its obligation under *Bruton* to either exclude or redact any statement by a co-defendant and pledged to provide Defendants with a redacted copy of any statement it intended to offer at trial.

The trial court reviewed the reasons for three prior continuances of the trial, including waiting on TBI's ballistics and gunshot residue testing, unavailability of the medical examiner due to trial conflicts, and being set behind other cases that had proceeded to trial. The trial court stated that it was prepared to revisit Defendant Booker's bond conditions should the medical examiner be unavailable for the yet to be announced new trial date. After a lengthy discussion about possible trial dates, a trial date of July 27-31, 2020, was set by agreement, and the trial court set June 5, 2020, as the State's deadline to provide Defendant Booker a redacted copy of Defendant Craig's statement. The trial court concluded the hearing by summarizing its rulings accordingly:

- 4 -

All right. And then as to the Motion to Sever, I have now addressed the speedily (sic) trial motion, I have now addressed a date for which a redacted statement will be given, I have previously articulated on the record the reasons for the joinder, I would incorporate now those previous findings and deny the Motion to Sever as filed by [Defendant] Booker. They will stay joined.

The trial court added that should the redacted statement present problems that are "insurmountable," the court would revisit Defendant Booker's motion to sever.

The trial did not commence until May 21, 2022. The record contains no information about any proceedings occurring between the motion hearing on March 6, 2020, and the trial in May 2022. The only reference to the trial being delayed was revealed in Defendant Booker's motion to alter the conditions of his bail which was filed on August 13, 2020. In the motion, Defendant Booker submitted that the trial, scheduled for July 27-31, 2020, was postponed due to the COVID-19 pandemic. He submitted further that "None of the continuances were caused by [him]." The trial court reduced the amount of Defendant Booker's bond from $250,000, to $200,000, with several enumerated conditions. The judgments reflect that Defendant Booker remained incarcerated.

On March 16, 2022, more than two years after the entry of the March 6, 2020 order on Defendant Booker's speedy trial motion and the severance motion, and five days before his trial, Defendant Booker filed his second motion for severance. Defendant Booker moved for severance based on the State's intent to use statements made by Defendant Craig to his girlfriend, Kellen Oden. Defendant Craig admitted to Ms. Oden that he had shot the victim "in the body" but his "homeboy" shot the victim in the head and that his "homeboy" had given him a 9mm caliber handgun that was used in the shooting. Although he was not identified as "homeboy," Defendant Booker maintained that the statement was incriminating to him because one could logically determine that he was "homeboy." Although Defendant Booker understood that the State intended to offer the statement without identifying Defendant Booker as the person who provided Defendant Craig with the gun, Defendant Booker maintained that the testimony was inadmissible hearsay and would deprive him of a fair trial.

The second severance motion was heard the morning of trial. The State clarified that no statement by Defendant Booker would be offered at trial. The State intended to use Defendant Craig's statement about a gun because it was made to a detective, not Ms. Oden. Specifically, Defendant Craig told the detective he could get the murder weapon. There would be no testimony identifying Defendant Booker as the person who gave Defendant Craig the gun. As for the statement Defendant Craig made to Ms. Oden that "homeboy"

shot the victim in the head, the State asked for some leeway in questioning Ms. Oden about Defendant Craig's confession about shooting the victim to avoid any mention of Defendant Booker shooting the victim in the head. Counsel for Defendant Booker indicated that no objection would be lodged should the State lead Ms. Oden during this part of her testimony but added that he would move for a mistrial if she mentioned Defendant Booker shooting the victim in the head. Based on the assurances of the State regarding both statements, the trial court denied the second motion to sever the case.

*Trial*

On May 6, 2018, around 1:25 a.m., Jesse Hughes, an officer with the Columbia Police Department ("CPD") was in his vehicle working on a report from a prior police dispatch when he heard several gunshots from the direction of River Villa Apartments. Officer Hughes testified that he heard several gun shots in "rapid succession" followed by a brief pause, and then another gun shot. Officer Hughes alerted dispatch that shots had been fired at River Villa Apartments and he advanced on foot to River Villa Apartments where he met up with two other officers who arrived at the scene. The three officers proceeded to the parking lot adjacent to apartment unit five where they heard people yelling. One of the people yelling was a woman later identified as Megan Diaz. She was outside yelling, "He's hit. He's hit." As the officers approached Ms. Diaz, they saw a man lying on the ground, adjacent to the sidewalk, on his stomach and partially rolled to his right with his head facing the doorway of unit five. This man was later identified as the victim, Derrick Wells. The victim was still breathing but it was very labored. Officer Hughes observed that the victim had sustained multiple gunshot wounds to the temple behind the right eye, the chest, the back, the buttocks, and a leg. He saw a bullet fragment underneath the victim's skin on his leg. Although he could not recall whether the victim had anything in his hands, Officer Hughes testified that he would have noticed if the victim had a weapon.

Officer Hughes attempted to stop the bleeding using items provided by Ms. Diaz as he and the others waited for the paramedics. By the time the paramedics arrived, the victim had stopped breathing. The autopsy report indicates that the victim was transported to the hospital where he was pronounced dead shortly after his arrival.

Megan Diaz was renting unit five, a studio apartment in the River Villa Apartment complex in May 2018 where she lived with her two-year-old daughter. Ms. Diaz had known the victim close to a year before his death. Although she and the victim were not romantically involved, she acknowledged that they had a sexual relationship. She considered him a friend and gave him a key to her apartment. She would permit him to stay with her when he could not stay with his uncle.

- 6 -

Ms. Diaz was also acquainted with two men who she knew by their nicknames, "Sleepy" and "K.B." She had known "Sleepy" four or five months before the shooting. She had known "K.B." since 2014 or 2015. She had seen "Sleepy" with the victim, but had not seen the victim hang around "K.B." She was aware that "Sleepy" owed the victim $25. The victim told "Sleepy" to pay him back later but "Sleepy" never did. The victim said that he was going to speak to "Reggie" about what had happened. "Reggie" or Reginald Wade was a neighbor who lived in an apartment diagonally from Ms. Diaz. At trial, she identified Defendant Craig as "Sleepy," and Defendant Booker as "K.B." To her knowledge, Defendant Booker was not involved in the dispute over the $25.

Ms. Diaz testified that on May 5, 2018, the day before the shooting, she stayed at home with her daughter. She observed Defendant Craig in a blue Impala "driving back and forth all day that day" past her apartment. She could not recall who was driving but clearly saw Defendant Craig in the car. In the evening, the victim dropped off Ms. Diaz and her daughter at the home of Kayla Dick, Ms. Diaz's daughter's stepmother who lived down the street past the apartment complex. Ms. Diaz and her daughter remained at Ms. Dick's home until 1 a.m. When Ms. Diaz returned home, she was met outside by her friend Leon Ricks. Ms. Diaz invited Mr. Ricks inside and put her daughter to bed. Mr. Ricks brought her some food from O'Charley's where he worked. Ms. Diaz testified that she had some alcoholic beverages that evening but that they did not affect her recollection of what occurred that night; she was sufficiently sober to be aware of her surroundings.

As Ms. Diaz and Mr. Ricks talked, someone knocked on her door. She opened the door and saw Defendant Craig and Defendant Booker. The two men entered her home and announced that they were looking for someone. Ms. Diaz and Defendant Craig talked casually. About five to ten minutes later, Ms. Diaz saw headlights through her windows. She testified that the victim was backing into the driveway in front of her apartment driving Ms. Dick's car. Ms. Dick permitted Ms. Diaz and the victim to use her car because they helped her make the car payments.

Ms. Diaz went outside to encourage the victim to leave. She told him that Defendant Craig and Defendant Booker were in her apartment and she did not know why. She was concerned because of the money Defendant Craig owed the victim. She suggested the victim return after Defendant Craig and Defendant Booker were gone but the victim declined to do so.

When Ms. Diaz entered the apartment, she saw that Defendant Craig and Defendant Booker were in her bathroom. Seconds later, the victim walked into the apartment and began opening a kitchen cabinet as if to look for something. Defendant Craig spoke to the victim; she did not recall Defendant Booker being engaged in the conversation. Ms. Diaz recalled that Defendant Booker was standing in front of Defendant Craig, and Mr. Ricks

was in the kitchen. While Defendant Craig and the victim spoke, out of the corner of her eye, Ms. Diaz saw Defendant Craig pull a gun out of his pocket with his left hand and hold it against the side of his leg. Ms. Diaz then heard a clicking sound as if the gun was being cocked. Defendant Craig then asked the victim to step outside to talk. The victim agreed and Defendant Craig and Defendant Booker followed the victim outside. Mr. Ricks remained in the apartment with Ms. Diaz and her daughter who was still asleep. Ms. Diaz testified that the victim was not armed. She also testified that she did not see Defendant Booker with a gun.

Ms. Diaz could not hear the three men talking. About five to ten minutes later, Ms. Diaz heard four gunshots in rapid succession, followed by a pause, then two more gunshots. She saw the muzzle flash from a gun through the windows next to her daughter's bed. She went outside and saw the victim on the ground behind the trunk of Ms. Dick's car curled up on his right side, making "some noises," but not moving.

Ms. Diaz ran back to her apartment and grabbed her daughter to move her away from the windows. She made her way outside again and saw that a crowd had gathered near the victim. She heard police sirens approaching the apartment complex and waited inside her apartment for the police and paramedics to arrive. She explained that she was trying to arrange for someone to come get her daughter. She testified that she did not call the police and assumed that the neighbors would lead the police to the victim. She saw the police arrive but left to take her daughter to Ms. Dick's. When she returned to her apartment, she assisted the police in treating the victim by providing towels and sheets to stop the bleeding.

Although she did not see how Defendant Craig and Defendant Booker arrived at her apartment, Ms. Diaz told Officer Hughes that she had previously seen Defendant Craig in a dark blue Impala which belonged to his girlfriend, Kellen Oden, driving back and forth past her apartment the day before the shooting. Ms. Diaz gave physical descriptions of Defendant Craig and Defendant Booker and voluntarily went to the police station that morning where she identified Defendant Craig out of a sequence of six photographs. At trial, Ms. Diaz identified Defendant Craig and Defendant Booker as the two men who followed the victim outside before she heard the gunshots.

George Bullock, a pastor and a Columbia native, testified that on the evening of May 5, 2018, he was visiting his sister at her apartment in River Villa. The two of them delivered newspapers for the Daily Herald on the side. That evening, after visiting with his sister for a few hours, he went to his truck, a 2003 Trail Blazer, which he parked in front of her apartment, unit eight, to take a phone call and eventually went to sleep. He had to be at the Daily Herald to pick up the newspapers for his delivery no later than 3 a.m.

Mr. Bullock testified that he awoke when he saw a "dark car" drive back and forth in the parking lot before finally parking on the left side of his car. A van was parked on the other side of the "dark car." Mr. Bullock explained that the windows of his car were tinted, and his seat was reclined "as far as it would go" so he could nap. Mr. Bullock observed two men get out of the car; he did not recognize them. He added that the area was not well-lit. He described the driver as a short, dark-skinned man with dreadlocks. He could not get a good look at the passenger other than that he appeared to be taller wade the driver and of lighter complexion. The two men walked toward the van and disappeared from Mr. Bullock's view. He saw nothing amiss and tried to go back to sleep.

Several minutes later, he heard "a couple" of gunshots and the same two men he saw moments earlier returned to the car parked next to him and got inside. Seconds later, the shorter man seated in the driver seat exited the car while the taller man remained inside. Mr. Bullock was "pretty sure" the shorter man had "a firearm in his hand." He clarified that the taller man "had a firearm in his hand, too." The shorter man returned to the same area on the other side of the van obscuring Mr. Bullock's view. Mr. Bullock then heard another gunshot. The shorter man returned to the "dark car," backed out of the parking space and drove out of the apartment complex. Mr. Bullock acknowledged that he did not see who fired the shots or who was being fired upon.

Mr. Bullock got his sister out of her apartment, and the two of them drove to the Daily Herald. He admitted that he did not call the police because he did not want to get involved. As he exited his car to get his sister, he saw a person on the ground who he recognized. At trial, Mr. Bullock did not elaborate or identify the victim by name. Mr. Bullock testified that he did not walk over to the victim but went directly into his sister's apartment because they needed to "g[e]t out of there." He learned "that night" that the victim had died.

Mr. Bullock and his sister delivered the newspapers per their regular routine. He did not return to the scene or report to the police what he had seen until May 17, 2018, when he talked to Officer Cox[2] of the CPD. Because Officer Cox had been Mr. Bullock's high school football coach and had remained a constant presence in his life, Mr. Bullock was comfortable talking to him. Mr. Bullock reached out to Officer Cox because he did not believe that Defendant Booker was the dark-skinned man with dreadlocks seen driving the getaway car. He explained that the driver was shorter and more slender than Defendant Booker. Mr. Bullock testified that he "probably" told Officer Cox that Reginald Wade was one of the men involved in the shooting. Mr. Bullock knew Mr. Wade although he did not

---

[2] Mr. Bullock did not provide Officer Cox's first name. After Defendant Craig was apprehended in Chattanooga, Officer Orlando Cox was one of two officers who went there to transport Defendant Craig back to Columbia. The record does not indicate whether Officer Orlando Cox was the same officer who spoke with Mr. Bullock.

know where Mr. Wade lived or if he frequently "hung out" at River Villa. According to Mr. Bullock, Mr. Wade was shorter and more slender than Defendant Booker. He acknowledged that he did not "really remember too much" of what he told Officer Cox and that ultimately, he "wasn't sure who it was[.]"

Based on information gathered at the crime scene, CPD Corporal Michael Johns, with three officers and two deputies, went to 601 East Ninth Street in search of a dark blue or black Chevy Impala that had been seen leaving River Villa Apartments at the time of the shooting. The Impala was registered to Ms. Oden. A blue Impala was parked next to the stairs leading to her home. Corporal Johns knocked on the door and window and got no response. One of the officers felt the hood of the Impala and it was still warm, suggesting that the car had recently been driven and that someone was inside the home.

Corporal Johns and the other officers secured the area. One of the officers used a public address system mounted on a patrol car and ordered anyone in the home to come out. Eventually, Ms. Oden, Defendant Craig, and several small children exited the home. Ms. Oden consented to a search of her home. Defendant Craig refused to be tested for gunshot residue. Corporal Johns testified that Defendant Craig was not under arrest at the time of the search and was free to leave. He could not recall whether Defendant Craig left the scene.

Kellen Oden[3] testified that in May 2018, she and Defendant Craig had been in a relationship since 2015. He lived with her and her five children. At the time of the shooting, she was unaware that she was pregnant with her sixth child. Defendant Craig was the father of her three youngest children. Ms. Oden testified that she also knew Defendant Booker. He was known as "K.B." According to Ms. Oden, Defendant Craig and Defendant Booker "were always together." At trial, she identified Defendant Booker in the courtroom.

Ms. Oden confirmed that she owned the blue Impala but could not drive it because she did not have her license. She permitted Defendant Craig to use her car while she was at work. He usually drove her to work and sometimes picked her up.

On May 5, 2018, Ms. Oden finished a double-shift at work and returned to her home after 8 or 9 p.m. Defendant Craig and Defendant Booker were there with her children. Ms. Oden had come home to change clothes to attend a birthday celebration with her friends. She could not recall when she left but knew that she returned home between 1:00 and 1:30 a.m. When she returned, the Impala was not parked outside and neither Defendant Craig

---

[3] Although this witness was married and had changed her last name by the time of trial, we will refer to her by her last name at the time of the incident consistent with the evidence. No disrespect is intended.

nor Defendant Booker were there. Ms. Oden showered to get ready for bed and as she finished her shower which had been twenty to twenty-five minutes, Defendant Craig and Defendant Booker entered her home. She recalled that Defendant Booker did not stay long. The next thing she remembered was the police knocking on her door. Ms. Oden was not expecting the police and knew of no reason they would come to her home. She testified that she would ordinarily open her door but Defendant Craig "wouldn't let [her]" because he had "done something bad." He did not elaborate and instead began hiding things in her air vents. The noise from the police awakened the children. Defendant Craig instructed everyone to remain quiet. Ms. Oden could see the flashing lights from the patrol vehicles and could hear the police walking outside around her home.

She knew the police would enter by force if she did not open her door soon, so she opened her door and walked out with her hands raised while carrying her five-month-old on her hip. Defendant Craig and the rest of her children followed suit. She gave the police permission to search her home and talked to the officers at the scene. She did not reveal to them at that time that Defendant Craig told her not to open the door because he had "done something bad."

Ms. Oden identified her car in a photograph taken of the outside of her home before the search. She had purchased the car from Bostelman, a dealership in town, and it came with a Bostelman tag on the front of the car. During the search of her home, officers found the tag hidden underneath or behind a couch. She testified that she had not removed the tag and although she did not see him do it, she "assume[d]" Defendant Craig had removed the tag. The police seized her car as part of the search.

After the police left, Defendant Craig had Ms. Oden and her cousin, Maria Oden drive him to his father's house in Chattanooga. Before Maria[4] arrived, Defendant Craig told Ms. Oden that he had shot the victim "in his body." Ms. Oden recalled being "scared" and unable to think upon hearing his confession, but she continued to help him get to Chattanooga. Ms. Oden arranged for someone to care for her children and rode with Defendant Craig and Maria to Chattanooga.

Ms. Oden testified that they left as the sun was coming up. Maria dropped off Ms. Oden and Defendant Craig at Defendant Craig's father's house in Chattanooga and drove back to Columbia alone. Defendant Craig left soon after he arrived at his father's home. Ms. Oden stayed at Defendant Craig's father's house to sleep because she had been up all night. She slept long enough for Maria to return to Columbia. Ms. Oden then called Maria

---

[4] We will refer to Maria Oden by her first name to avoid confusion with Kellen Oden. No disrespect is intended.

to pick her up. Maria obliged and the two of them returned to Columbia without Defendant Craig.

When she returned home, Ms. Oden found the gun Defendant Craig had hidden in one of the air vents. Ms. Oden testified that the gun was a .45 caliber handgun which she had purchased from a pawnshop in town. She kept the gun "up high" on a shelf so her children would not play with it. After the shooting, she gave the gun to a cousin, Joey Lock because she "wanted it out" of her home. Ms. Oden agreed that she should have instead called the police, but she was "scared" to do so. However, Ms. Oden went to the police department on Monday, May 7, 2018, because her conscience "was bothering [her] all that night." She admitted to the police that she had gotten rid of a gun Defendant Craig had hidden in an air vent in her home. The next day, Defendant Craig called Ms. Oden at work and asked her if she had gotten rid of "the thing," meaning the gun. Ms. Oden could not recall what she told him. After the call ended, a detective sent Ms. Oden a text message confirming Defendant Craig's arrest.

Ms. Oden testified that she had been charged with accessory after the fact and tampering with evidence for her role in the case. She denied that she was offered any deals or promises for her testimony. Ms. Oden acknowledged however, that she hoped "things w[ould] go well for her" by testifying. She admitted that she enjoyed several drinks at her friend's party and had a "good buzz" when she got home. She testified that Defendant Craig did not say that the victim was armed. She acknowledged that her memory about the shooting was "horrible now" and better near the time of the shooting when she talked to the police. Ms. Oden admitted that she was not entirely truthful when she first spoke to the police as her home was being searched. She maintained, however, that she was truthful when she talked to the police the second time after she and Maria had taken Defendant Craig to Chattanooga. She also clarified that she had two guns. She had thrown one gun away in her trash bin outside soon after she purchased it and before the shooting because she did not think it was good to have a gun accessible to Defendant Craig.

On cross-examination by Defendant Booker's counsel, Ms. Oden acknowledged, after reading the statement she gave at the police department, that she did not mention that Defendant Booker was in her home after she finished her shower. She insisted, however, that he was there and left before the police arrived. She added that she was asked primarily about Defendant Craig during the interview.

On May 8, 2018, Detective Joshua Garner[5] and Sergeant Orlando Cox drove to Chattanooga to bring Defendant Craig back to Columbia after he had been apprehended by the Chattanooga Police Department. Among Defendant Craig's effects at his arrest were his birth certificate and a prepaid AT&T phone box. The receipt showed that the phone was purchased May 7, 2018. During the three-hour drive, Defendant Craig was advised of his *Miranda* rights and agreed to waive them to talk to the two officers. Sergeant Cox drove, Detective Garner sat in the front passenger seat, and Defendant Craig sat in the back seat behind a partition which had a sliding window opened slightly so the officers could communicate with Defendant Craig. The conversation was recorded on Detective Garner's pocket audio recorder and played for the jury.

Detective Garner asked Defendant Craig about his nicknames because a person nicknamed "Sleepy" was involved in the shooting. Defendant Craig agreed that he went by the nicknames of "Sleepy" or "Dooney." He denied that either were street names. On the recording, Detective Garner asked Defendant Craig whether "anyone talked to him while he was *out there*." At trial, Detective Garner explained that "out there" referred to Ms. Oden's home when the police arrived to search her home and seize her car. Defendant Craig denied that he knew anyone named Booker or who went by the initials, "K.B." He also denied knowing anyone else who went by the nickname "Sleepy."

Detective Garner had obtained information that Ms. Oden owned a .45 caliber pistol. When questioned about Ms. Oden's gun, Defendant Craig first stated that he did not know she owned a gun. He then said that her gun had been stolen but neither he nor Ms. Oden reported it. Detective Garner testified that when they reached Columbia, they took Riverside Drive past the River Villa Apartments rather than Nashville Highway because it was a faster route to the police station. As they drove by River Villa Apartments, unprompted, Defendant Craig asked whether the officers wanted to know where one of the murder weapons was located. Detective Garner found Defendant Craig's mention of a weapon as they were driving by where the shooting occurred to be significant. Detective Garner asked Defendant Craig, "which murder?" Defendant Craig offered to retrieve a 9mm caliber gun if he were released. Detective Garner testified that Defendant Craig "never gave a specific location other than just a vague description of where it may be."

At the police station, Defendant Craig was apprised of his *Miranda* rights a second time. His interview at the station was recorded on a video recording device and three clips were played for the jury. In the first clip, Defendant Craig called Ms. Oden on Detective Garner's work phone after he signed the waiver of rights form. The call went unanswered.

---

[5] At the time of trial, Detective Garner had been promoted to Corporal in the patrol division. We will refer to him according to his rank at the time of the offenses to be consistent with the evidence and testimony at trial. No disrespect is intended.

In the second clip, Defendant Craig called Ms. Oden again and she answered the call while at Cracker Barrel where she worked. Because Defendant Craig made the call on speakerphone, the full conversation was recorded. Detective Garner left the interview room as Defendant Craig began talking to Ms. Oden. Detective Garner testified that he was able to monitor the room and hear their conversation live from a small observation room where interview recordings are stored.

After Detective Garner left the interview room, Defendant Craig asked Ms. Oden, if "that thing [was] still there?" She replied, "It's already been done." Defendant Craig became distraught and repeatedly told her that she "f***ed me up." In the third clip, Defendant Craig told Ms. Oden not to tell anyone why she wanted "it" back and without "it," he did not know what to tell "them when they return." At trial, Detective Garner determined that Defendant Craig and Ms. Oden were talking about the gun. Detective Garner testified that after he left the interview room, he had no further contact with Defendant Craig and that Defendant Craig never admitted to having a role in the victim's death.

In addition to talking to Defendant Craig, Detective Garner examined the crime scene. At trial, he described the ballistics evidence found at the scene consisting of cartridges of two different calibers: .45 caliber and 9mm caliber. Most of the spent shell casings or bullet fragments were .45 caliber. One 9mm caliber casing was found. One live 9mm caliber round was later discovered in the parking lot by a resident. Detective Garner explained that a .45 caliber projectile is larger than a 9mm caliber projectile and that the two cannot be fired from the same weapon. The official firearms report examination of the cartridge cases was admitted by stipulation, and the findings were read into the record. Seven .45 caliber cartridge cases recovered at the scene had "all been fired in the same unknown .45 auto caliber firearm."

Detective Garner did not contact Ms. Oden's cousin, Mr. Lock, about Ms. Oden's .45 caliber gun because he had not interviewed Ms. Oden and was thus unaware that Ms. Oden said she had given the gun to Ms. Lock. The detective who had interviewed Ms. Oden had moved to Palm Beach, Florida. Detective Garner testified that the CPD did not contact Mr. Lock because Ms. Oden had retained counsel. Under the circumstances, Detective Garner testified that the chance of retrieving the gun would not have been promising at that point. No weapons associated with the case were ever recovered.

Detective Garner collected several pieces of the victim's clothing at the scene and found a .25 caliber semi-automatic handgun "deep" in the front left hip pocket of the victim's pants. He also found cash in various denominations and several small bags of what appeared to be narcotics in larger pockets separate from the gun. Detective Garner removed the magazine and saw that it was fully loaded with a live round in the chamber.

He testified that it would not have been possible for the victim to have fired the gun without reloading it and putting it in his pants pocket before it was discovered by Detective Garner. He confirmed that no .25 caliber casings or fragments were found at the scene.

Detective Garner used information from Defendants' driver's licenses in drafting the warrant for their arrest. Defendant Craig's height was listed as six feet, three inches, and Defendant Booker's height was listed as five feet, seven inches. Defendant Booker was arrested a day or two after the shooting. A forensic examination of his phone showed no data or communication prior to, or after May 7, 2018. The first text message on his phone was on May 7, 2018, at 3:32 p.m., welcoming Defendant Booker to his new cell phone service. Detective Garner had reviewed Ms. Oden's three statements and agreed that she had not mentioned Defendant Booker being in her apartment the night of the shooting.

Detective Trent Thomson[6] assisted in the search of Ms. Oden's home and secured the warrant to search the blue Impala. In the backseat of the Impala was a Speedway convenience store bag containing a cardboard carton with four long-necked, glass bottles of Miller High Life Beer. Detective Thomson testified that he was "pretty familiar" with Columbia, and there was only one Speedway in town. He obtained consent to search the security footage from the Speedway gas station to track down when the beer was purchased. Detective Thomson explained that the security system at the Speedway was atypical in that the security footage was tied to the point-of-sale of a particular item. Detective Thomson typed in "Miller High Life" in the security footage search engine to locate footage from whenever "Miller High Life" was purchased. Among the search results for "Miller High Life," Detective Thomson located footage of a dark sedan driven by two African-American men who resembled Defendants between 12:50 a.m. to 12:58 a.m. on May 5, 2018.

The footage exhibited a compilation of the same activity from different cameras and showed a dark sedan back into a handicapped parking space in front of the Speedway. Two men exited the car. The front seat passenger, a man with long dreadlocks, entered the Speedway while the driver crouched down as if to look for something in the floorboard. The passenger exited the Speedway and then re-entered the Speedway with the driver who was shorter than the passenger. After the driver exited the store, the passenger purchased a carton of beer.

---

[6] Detective Thomson had been promoted to the position of sergeant in the support services division of the CPD by the trial. We will refer to his rank at the time of the incident consistent with the evidence. No disrespect is intended.

As part of the search of the Impala, Detective Thomson also swabbed the car for gunshot residue. He took swabs of any areas of the car where the "hand would predominantly touch" such as the inside and outside the driver side and passenger side door handles, the steering wheel, and the gear shift.[7] The swabs were tested by TBI forensic scientist Kyle Osborne, who testified that gunshot residue was detected on the outside of the driver side door handle, the steering wheel, and the gear shift. One particle was found on the inside of the driver side door handle, but the amount was insufficient to test positive for gunshot residue. No trace of residue was found on the inside or outside of the passenger side door handle. Agent Osborne explained that a person can be exposed to gunshot residue without firing a gun. The zone of exposure could include being near the person firing the weapon, the person shot, or the person who handled the weapon after it was fired.

Miguel Laboy, M.D., the medical examiner, conducted the victim's autopsy on May 7, 2018. Dr. Laboy determined the victim's cause of death to be multiple gunshot wounds and the manner of death to be homicide. Dr. Laboy testified that the victim sustained gunshot wounds to the left eyelid, the chest, the left buttocks, the right thigh, and the left arm. Dr. Laboy discovered two gunshot wounds to the chest, one of which was a fatal wound in that the bullet perforated the diaphragm, the liver, the soft tissue near the pancreas, the aorta near the iliac arteries, and the lumbar vertebra. Dr. Laboy recovered bullet fragments near the right eyebrow and two bullets from the right thigh and one bullet from the shaft of the penis. The three bullets were of medium caliber and contained plastic-like material at the tip.[8]

For count two of the indictment, Defendant Booker stipulated that he had been previously convicted of possession of marijuana for resale, a class E felony, and Defendant Craig stipulated that he had a prior qualifying felony conviction without revealing that it was an aggravated robbery conviction.

Defendants elected not to testify or offer proof.

Based on the evidence, the jury convicted Defendant Booker of the lesser-included offense of facilitation of first degree murder in count one and facilitation of aggravated assault resulting in death in count three. He was found guilty of being a felon in possession of a firearm as charged in count two. The jury convicted Defendant Craig of all counts as charged.

---

[7] Defendants stipulated that the chain of custody had been met for the gunshot residue evidence.

[8] The caliber of the bullets was not identified.

- 16 -

*Sentencing*

Because the State sought a sentence of life without parole for Defendant Craig, following the jury's verdict, a bifurcated sentencing hearing was held for Defendant Craig on the first degree murder conviction. The State elected two aggravating factors: Defendant Craig had been previously convicted of one or more felonies other than the present charge, the statutory element of which involved the use of violence to the person; and he knowingly created a great risk of death to two or more persons, other than the victim murdered, during the act of murder. T.C.A. § 39-13-204(i)(2), (3). The State offered certified copies of judgments bearing two prior convictions for aggravated robbery. Defendant Craig stipulated to the first aggravating factor regarding the prior felony convictions. Defendant Craig submitted four mitigating factors: the murder was committed while he was under extreme mental or emotional disturbance; the victim was a participant in Defendant Craig's conduct; the murder was committed under circumstances that Defendant Craig reasonably believed to provide a moral justification for his conduct; Defendant Craig was an accomplice in the murder committed by another person and Defendant Craig's participation was relatively minor. *Id.* § 39-13-204(j)(2), (4), (5).

Defendant Craig testified and denied that he and the victim had a "beef" over $25. He implied that there was a disagreement but "[i]t was because we was (sic) [at Ms. Diaz's apartment] selling drugs." According to Defendant Craig, Ms. Diaz's apartment was a "trap house" or a place where people bought and sold drugs. Defendant Craig testified that the victim went to Ms. Diaz's apartment and "had words" with everyone there including Ms. Diaz. He denied that he pulled out his gun in the apartment and cocked it before heading outside with the victim as Ms. Diaz testified to at trial. He admitted that he went outside with the victim to talk but once outside, the victim became "aggressive." He testified that he shot the victim because the victim was "reaching" for something, and Defendant Craig "feared for his life." He stated twice that had the victim shot him, no one would have known because the victim was Ms. Diaz's "old man."

On cross-examination, Defendant Craig admitted to shooting the victim with a .45 caliber gun. He denied that the gun belonged to Ms. Oden or that he put it in a vent. He testified that he "threw it in the water." Defendant Craig maintained that Defendant Booker was not involved and had left before the shooting occurred. He testified that he left River Villa alone and, in someone else's car, not Ms. Oden's Impala. He did not deny that he and Defendant Booker drove Ms. Oden's Impala to the Speedway to purchase beer; however, he insisted that the two returned to Ms. Oden's home, dropped off the Impala, and he left in someone else's car. He denied shooting the victim in the eye. He maintained he did not know who shot the victim in the eye but denied that he did it. He stated that he was "too spooked" to dial 911 after he shot the victim. The jury sentenced Defendant Craig to life imprisonment.

- 17 -

As for the remaining two convictions, the judgments reflect that the trial court sentenced Defendant Craig to eight years for being a felon in possession of a firearm and three years for aggravated assault resulting in death. The trial court ran the two sentences concurrently with each other and with the sentence of life imprisonment. The judgments were entered on May 20, 2022.[9]

Defendant Booker's sentencing hearing was held on May 20, 2022. His presentence report was admitted without objection. In his interview for the report, Defendant Booker denied involvement in the shooting. He told Officer Monique Wells, who prepared the report, that he arrived at the apartment "to sell someone some drugs and someone told the cops [he] was there," and left the apartment before the shooting. He stated that several people denied seeing him at the time of the shooting. He maintained that he was convicted "simply because [he] had a trial side by side with the person believed to be guilty." Officer Wells read Defendant Booker's criminal convictions into the record, noting seven misdemeanor convictions, one felony conviction, and one probation revocation. Defendant Booker committed the instant offenses while he was on probation for simple possession of marijuana. Defendant Booker was categorized as being affiliated with a "security threat group." He had been diagnosed with bone cancer, which was in remission at the time of sentencing.

The victim's widow, Ginger Janet Wells, wrote in her victim impact statement that Defendant Booker should receive the "least" possible sentence because he was simply "a black man who picked the wrong day to hang with the supposed-to-be friend, . . . resulting in loss of life." Mrs. Wells testified that she had been married to the victim for seventeen years and reiterated her desire for Defendant Booker to receive the "least" possible sentence. On cross-examination, Mrs. Wells acknowledged that she called Defendant Booker her nephew because he was related to the victim. She understood that the jury may have taken the level of Defendant Booker's involvement into account by convicting him of facilitation, and not first degree murder.

When questioned by the trial court, Mrs. Wells confirmed that she attended the sentencing phase of Defendant Craig's trial. She recalled that Defendant Craig testified and accepted blame for shooting the victim in the body but denied shooting the victim in the head. Although he did not implicate Defendant Booker, Defendant Craig's testimony suggested that whoever was with him had shot the victim in the head. Mrs. Wells was incarcerated when the victim was killed. She testified that during a phone conversation with Ms. Diaz while Mrs. Wells was incarcerated, Ms. Diaz "said with her own words that it was Mr. Wade. Had she not said that, it wouldn't have made me think any other

---

[9] Defendant Craig's sentencing transcript is not part of the record.

different." Mrs. Wells said the jail phone conversation with Ms. Diaz was recorded but conceded that she did not inform the State about it. On redirect examination by Defendant Booker's counsel, Mrs. Wells maintained her belief that Mr. Wade was the other gunman.

The trial court applied five enhancement factors and no mitigating factors. The trial court gave great weight to the fact that Defendant Booker was on probation for a marijuana conviction at the time of the crimes and that he possessed a history of criminal conduct in addition to those necessary to establish the sentencing range. T.C.A. § 40-35-114(1), (13)(c). The trial court agreed with the State that Defendant Booker was a leader in the commission of the offense based on the victim's gunshot wound to the eye. *Id.* § 40-35-114(2). The trial court noted that although Defendant Craig denied that Defendant Booker was involved, Defendant Craig also denied that he shot the victim in the eye or used a 9mm caliber gun. The trial court reviewed the victim's numerous gunshot wounds and described them as "really cruel," noting that in addition to being shot in the leg, chest, buttock, thigh, and arm, the victim was also shot in the face above the left eye. The trial court recalled that this bullet exited the right side of the victim's head and was "certainly the fatal shot." The trial court applied the leadership factor to counts one and three, giving it moderate weight, and also found that Defendant Booker had no hesitation about committing a crime where the risk to human life was high in that the shooting occurred near where Ms. Diaz's daughter was sleeping, also giving this factor moderate weight. The trial court sentenced Defendant Booker to four years for being a felon in possession of a firearm, three years for facilitation of aggravated assault, and seventeen years for facilitation of first degree murder and ran all three counts concurrently for a total effective sentence of seventeen years. The judgments were entered on May 20, 2022.

Defendant Booker filed a timely motion for new trial on June 15, 2022, claiming that the trial court erred in denying his motion for severance and that the evidence was insufficient to support his convictions. He also renewed his motion for judgment of acquittal under Rule 29 of the Tennessee Rules of Criminal Procedure. Although Defendant Booker agreed at the hearing on the motion that the State took "great lengths . . . to prevent" any statements incriminating to him at trial, Defendant Booker maintained that his case should have been severed from Defendant Craig. He also alleged that severance was warranted because the defenses were antagonistic. In terms of sufficiency, Defendant Booker argued that the proof did not establish his identity as one of the shooters and the proof did not show he possessed the mens rea required for facilitation.

The State responded that the trial court correctly joined Defendants for trial, arguing that "extensive steps" were taken to "successfully" avoid any *Bruton* issues at trial and that antagonistic defenses are common in joint trials and do not necessarily require severance. As for the sufficiency issue, the State noted that the jury rejected that portion of Mr. Bullock's testimony about Defendant Booker and accredited Ms. Oden's testimony that

Defendant Booker was with Defendant Craig on the night of the shooting. The motion for new trial was denied and the order was entered on August 22, 2022. Defendant Booker filed a timely notice of appeal on September 21, 2022.

On June 27, 2022, Defendant Craig filed an untimely motion for new trial. On July 6, 2022, an agreed order was entered to accept the late-filed motion for new trial. The motion was heard on August 19, 2022. Defendant Craig's counsel at the hearing explained that she was co-counsel at trial, had not attended the entire trial, but had reviewed Defendant Craig's motion for new trial filed by co-counsel. She requested the hearing be continued "to a date after an appeal attorney is appointed." That request was denied and co-counsel proceeded with argument based on the motion that had been filed. The trial court denied the motion for new trial. The entry of denial was entered on August 22, 2022, along with the appointment of appellate counsel.

On April 4, 2023, Defendant Craig filed a motion to waive the time for filing the notice of appeal arguing in part that she had been appointed counsel on August 19, 2022, and that the deadline to file a timely notice of appeal was September 18, 2022. In the same motion, Defendant Craig moved to consolidate his appeal with Defendant Booker who did not oppose consolidation. This court waived the timely filing of the notice of appeal in the interest of justice and consolidated Defendants' appeals.

## Analysis

### Defendant Craig

Despite this court's decision to waive the timely filing requirement of the notice of appeal, we must clarify the procedural posture in which the case currently stands to determine which issues are properly before the court. To do so, we address whether the trial court had jurisdiction to accept Defendant Craig's late-filed motion for new trial and conclude that it did not.

Once judgment is entered, a defendant has thirty days to file a motion for new trial. *See* Tenn. R. Crim. P. 33(b). Where sentences are entered on different days, a motion for new trial is to be filed within thirty days from the day the last judgment is entered. *State v. Hatcher*, 310 S.W.3d 788, 801 (Tenn. 2010). The thirty-day provision is jurisdictional, and the time for filing cannot be extended. *See* Tenn. R. Crim. P. 45(b); *State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997). Thus, trial courts lack jurisdiction to hear and determine the merits of an untimely filed motion for new trial and a trial court's erroneous consideration of an untimely motion for new trial, which occurred in this case, does not validate the motion for purposes of appellate review. *Martin*, 940 S.W.2d at 569; *State v. Dodson*, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989) (holding that "[a] motion for a new

- 20 -

trial which is not timely filed is a nullity"); *see State v. Manning*, No. E2022-01715-CCA-R3-CD, 2023 WL 7439203, at *2 (Tenn. Crim. App. Nov. 9, 2023) (holding that the State's agreement, the defendant's proposed agreed order, nor the trial court's consideration of an untimely motion for new trial validates the motion), *perm. app. denied* (Tenn. May 16, 2024). While not divesting this court of jurisdiction, the failure to file a timely motion for new trial waives plenary review of all appellate issues except sufficiency of the evidence and sentencing. *See* Tenn. R. App. P. 3(e); *Dodson*, 780 S.W.2d at 780; *State v. Williams*, 675 S.W.2d 499, 501 (Tenn. Crim. App. 1984).

In this case, after finding Defendant Craig guilty on all four counts at trial, the jury sentenced him to life imprisonment for first degree murder on March 25, 2022. Thereafter, the trial court sentenced Defendant Craig on the remaining counts and the judgments for counts two and three were entered on May 20, 2022. Because the last judgment starts the thirty-day requirement for purposes of post-trial motions or notice of appeal, Defendant Craig had until Monday, June 20, 2022, to file a timely motion for new trial. *See Hatcher*, 310 S.W.3d at 801; Tenn. R. Crim. P. 33(b); Tenn. R. Crim. P. 45(a)(2) (extending deadline to the next business day the courthouse is open or accessible when the last day for filing falls on a Saturday or Sunday). The record shows Defendant Craig filed his motion for new trial on June 27, 2022, or seven days after the deadline had passed. Although the judgments had become final and the trial court was divested of its authority, the record includes an agreed order to accept Defendant Craig's late filed motion for new trial on July 6, 2022, and the trial court held a hearing on the motion for new trial on August 10, 2022, which it denied on August 22, 2022. Because Defendant Craig's motion for new trial was untimely, his issue claiming error on the jury instruction is waived. His appeal is limited to challenging the sufficiency of the evidence.

## I. Sufficiency of the Evidence

Defendant Craig argues that the evidence "failed to remove all other reasonable possibilities" in that "[t]here were no eyewitnesses, no positive identifications, no murder weapons, and a failed theory for motive." He also argues for the same reasons that the evidence weighed against the jury's verdict because the proof did not exclude every other reasonable theory except that of his guilt. He relies heavily on the rejected theory that a conviction based on circumstantial evidence must draw no other reasonable inference save the defendant's guilt. The State contends that the evidence supports the convictions. We agree with the State.

As a reviewing court, it is not our duty to reweigh the evidence in considering the sufficiency of the convicting evidence or view the evidence differently depending on whether it is direct or circumstantial. This court will review the sufficiency of Defendant Craig's convictions under the following well-settled principles. "[A] guilty verdict

'removes the presumption of innocence and replaces it with a presumption of guilt.'" *State v. Reynolds*, 635 S.W.3d 893, 914 (Tenn. 2021) (quoting *State v. Gentry*, 538 S.W.3d 413, 420 (Tenn. 2017)); *State v. Allison*, 618 S.W.3d 24, 33 (Tenn. 2021). On appeal, the burden shifts to the defendant who must demonstrate why the evidence is insufficient to support the conviction. *Allison*, 618 S.W.3d at 33; *State v. Jones*, 589 S.W.3d 747, 760 (Tenn. 2019). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see also* Tenn. R. App. P. 13(e).

Furthermore, "all reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *State v. Weems*, 619 S.W.3d 208, 221 (Tenn. 2021) (holding that the same standard of review applies when examining the sufficiency of the evidence and a motion for judgment of acquittal). This court is precluded from re-weighing the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017). Questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

Indeed, in *State v. Dorantes*, the supreme court rejected the view that to convict on circumstantial evidence alone, the proof must be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." *Dorantes*, 331 S.W.3d at 380. Accordingly, the standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *Id.* at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Defendant Craig's brief addresses sufficiency of the evidence only regarding his conviction for first degree murder which is the "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). A person acts intentionally "with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." *Id.* § 39-11-302(a). Premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(e). This means that:

> the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the

accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* Whether a defendant acted with premeditation is a question of fact for the jury. *State v. Clayton*, 535 S.W.3d 829, 845 (Tenn. 2017). Because evidence of premeditation is "inherently circumstantial," the existence of premeditation is often gleaned from the defendant's conduct. *State v. McKinney*, 669 S.W.3d 753, 773 (Tenn. 2023) (quoting *State v. Gann*, 251 S.W.3d 446, 455 (Tenn. Crim. App. 2007)). The following are non-exclusive circumstances a jury may consider to infer premeditation: (1) use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) declarations by the defendant of an intent to kill; (4) evidence of procurement of a weapon; (5) preparations before the killing for concealment of the crime; (6) calmness immediately after the killing; (7) a lack of provocation by the victim; and (8) the defendant's failure to render aid to the victim. *Id.* at 773 (citing *Clayton*, 535 S.W.3d at 845). A defendant's motive for the killing is yet another factor the jury may consider in its deliberation on premeditation. *Id.* (citing *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013)).

Defendant Craig contends the evidence is insufficient to support his convictions because the lack of gunshot residue on the passenger side door handle and Mr. Bullock's description of the man in the passenger seat of the Impala "open[ed] the door" to the possibility that someone other than he and Defendant Booker shot and killed the victim. Viewing the evidence in the light most favorable to the State, the jury observed and heard Mr. Bullock's testimony and did the same for the gunshot residue evidence and resolved any conflicts, inconsistencies, or gaps in favor of convicting Defendant Craig as charged in the indictment.

Foremost among the proof is Defendant Craig's confession to Ms. Oden that he shot the victim "in the body" many times and that he did not want her to open the door to the police because he had "done something bad." To hide his involvement in the victim's killing, Defendant Craig hid Ms. Oden's .45 caliber handgun in an air vent in her home and hid the Bostelman dealership tag from the Impala underneath a couch. He then fled to his father's home in Chattanooga. Ms. Diaz knew Defendant Craig and identified him in a photographic lineup and at trial as the man who entered her apartment, and while talking to the victim, brandished a gun, cocked it, and asked the victim to continue their conversation outside the apartment where shots were heard by three people, Ms. Diaz, Mr. Bullock, and Officer Hughes. Ms. Diaz heard four gunshots in rapid succession followed by a pause and then a single gunshot. She could also see the flash from the muzzle of the gun through the window of her apartment. Surveillance footage from the Speedway convenience store before the shooting was consistent with Mr. Bullock's testimony that the taller man he saw in the blue Impala was in the passenger seat. Mr. Bullock testified

that the taller man was armed and returned to the Impala right after he heard the first series of gunshots. The medical examiner testified that the victim died from multiple gunshot wounds. Officers found several .45 caliber spent shell casings at the scene indicative of multiple firings.

Although Defendant Craig denied being involved in killing the victim, he told police officers as they drove by River Villa Apartments on the way to the police station that he could locate one of the murder weapons on the condition that he be released. During the phone call in the interview room at the police station, Defendant Craig asked Ms. Oden where was the "thing," meaning the gun. When she replied that "it was gone," Defendant Craig became distraught and said repeatedly that she had "f****ed him." He stated that he offered to provide the "thing," to negotiate with the police but without it, he would be unable to do so. Based on the evidence, it was reasonable for the jury to conclude that Defendant Craig shot the victim multiple times with Ms. Oden's .45 caliber handgun causing the victim's death.

Additionally, the State presented evidence of multiple factors from which the jury was entitled to infer premeditation. Defendant Craig, a convicted felon, procured Ms. Oden's handgun before going to Ms. Diaz's apartment in search of the victim. Although a .25 caliber handgun was found on the victim, it was found "deep" within his pants pocket and fully loaded and no .25 caliber fired shell casings were found at the scene, suggesting that the victim, while armed, did not withdraw or fire his gun thereby undermining any argument that the victim provoked the confrontation or that Defendant Craig acted in self-defense. The victim sustained multiple gunshot wounds, one to the left temple where the bullet exited through the right side of his face and three bullets were found in his lower extremities including a bullet in the shaft of the victim's penis. Defendant Craig did not render aid to the victim but displayed calmness after the murder and worked to cover up his culpability and fleeing to Chattanooga soon after the police had finished the search of Ms. Oden's home. Additionally, there was some evidence of a motive, that Defendant Craig owed the victim $25. Upon review of the evidence in the light most favorable to the State, we conclude the evidence was sufficient to sustain Defendant Craig's conviction for premeditated first degree murder. Defendant Craig is not entitled to relief.

## II. Jury Instruction

In his final issue, Defendant Craig contends the trial court erred in failing to instruct the jury on the specific weight to be given to circumstantial evidence as set forth in *State v. Crawford*, 470 S.W.2d 610 (Tenn. 1971). As previously described above, this issue is waived because Defendant Craig filed an untimely motion for new trial. We observe further that had the motion for new trial been timely filed, the jury instruction issue would still be waived because Defendant Craig did not raise it in the motion for new trial.

Although it was squarely raised by the State in its brief, Defendant Craig has neither addressed the untimeliness of the motion for new trial and how it limits his review on appeal, nor has he argued for plain error review. The State argues that should this court consider the issue under the plain error doctrine, Defendant Craig is not entitled to relief because no unequivocal rule of law was breached. We agree with the State.

"Appellate courts are advised to use plain error sparingly in recognizing errors that have not been raised by the parties or have been waived due to a procedural default." *State v. Nelson*, 275 S.W.3d 851, 864 (Tenn. Crim. App. 2008). Accordingly, "where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*; *see State v. Sullivan*, No. E2022-00962-CCA-R3-CD, 2024 WL 268794, at *16 (Tenn. Crim. App. Jan. 24, 2024) (declining to review defendant's Rule 404(b) issue for plain error where defendant failed to raise an objection at trial, asserted the issue in an amended motion for new trial, failed to ask for plain error review on appeal, and no egregious or compelling reasons justified the court's review on appeal), *perm. app. denied* (Tenn. June 20, 2024).

Tennessee has long recognized that defendants have a constitutional right "to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury upon proper instructions." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (quoting *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001)). This right emanates from the right to a jury trial as set forth in our constitution. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); TENN. CONST. art. I, § 6. Because defendants have a constitutional right to a complete and correct charge of the law applicable to their case, we will exercise our discretion to review for plain error.

When determining whether plain error review is appropriate, the following five factors must be established: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused was adversely affected; (4) the defendant must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)).

Here, Defendant Craig is not entitled to plain error relief because the record clearly establishes that the trial court correctly instructed the jury on circumstantial evidence. As mentioned earlier in addressing Defendant Craig's sufficiency issue, the supreme court overruled the reasonable hypothesis language of *State v. Crawford*, by clarifying that no

- 25 -

distinction exists between direct or circumstantial evidence. *Dorantes*, 331 S.W.3d at 381; *State v. Sisk*, 343 S.W.3d 60, 66 (Tenn. 2011).

The record shows that the trial court gave the following instruction on circumstantial evidence:

> Circumstantial evidence is all testimony and exhibits which give you clues about what happened in an indirect way. It consists of all evidence which is not direct evidence. Do not assume that direct evidence is always better than circumstantial evidence. According to our laws, direct evidence is not necessarily better than circumstantial evidence and either type of evidence can prove a fact if it is convincing enough.

The instruction given to the jury was a correct statement of the law. "We have rejected any suggestion that circumstantial evidence is inferior to or less probative than direct evidence." *In re Markus E.*, 671 S.W.3d 437, 468 (Tenn. 2023) (citing *Dorantes*, 331 S.W.3d at 381); *see* 7 Tenn. Prac. Pattern Jury Instr. T.P.I.- Crim. 42.03(a) (2022) ("Do not assume that direct evidence is always better than circumstantial evidence. According to our laws, direct evidence is not necessarily better than circumstantial evidence. Either type of evidence can prove a fact if it is convincing enough.").

Because the record establishes that the trial court gave a correct instruction on circumstantial evidence, no unequivocal rule of law was breached; Defendant Craig's right to receive a complete charge of the law was not adversely affected. This issue is waived, and Defendant Craig is not entitled to plain error relief.

### **Defendant Booker**

#### I.   Motion for Speedy Trial

Defendant Booker contends that his constitutional right to a speedy trial was violated. He asserts that the length of the delay was presumptively prejudicial in that it caused him to endure a long pretrial incarceration and impaired his defense. The State responds that this issue is waived because Defendant failed to raise it as a claim for relief in his motion for new trial and failed to provide an adequate record for meaningful review. Alternatively, the State argues that Defendant is not entitled to relief under plain error which is the only standard by which this court can review this issue to grant relief.

Like his co-defendant, Defendant Booker has not addressed the State's claim of waiver. Nor has he requested review for plain error. "[A] party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do

with all other issues in the ordinary course of an appeal." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023), *no perm. app. filed*. In situations where the defendant fails to respond to a waiver argument, this court will consider the issue under plain error if compelling or egregious circumstances exist. *Thompson*, 2023 WL 4552193, at *5; *Sullivan*, 2024 WL 268794, at *16.

To determine whether compelling reasons exist to review this issue sua sponte, we look to the authority on the right to a speedy trial. "Both the United States Constitution and the Tennessee Constitution guarantee criminal defendants the right to a speedy trial." *State v. Moon*, 644 S.W.3d 72, 77 (Tenn. 2022), *cert. denied*, 143 S. Ct. 254 (2022); *see* U.S. CONST. amend. VI; TENN. CONST. art. 1 § 9. In Tennessee, the right to a speedy trial is also statutory. *See* T.C.A. § 40-14-101. In addition, the Tennessee Rules of Criminal Procedure provide for the dismissal of an indictment, presentment, indictment or criminal complaint, if an "unnecessary delay occurs in . . . bringing a defendant to trial." Tenn. R. Crim. P. 48(b).

"[B]y nature, a speedy trial violation claim is a mixed question of law and fact." *Moon*, 644 S.W.3d at 78. The reviewing court should give deference to the trial court's findings of fact unless the evidence preponderates against them. *Id.* Whether a defendant's right to a speedy trial has been violated "is a question of law to be determined de novo by a reviewing court." *Id.* To determine whether a defendant's constitutional right to a speedy trial has been violated, this court considers the following four factors: "(1) the length of the delay; (2) the reason for the delay; (3) whether there was a demand for a speedy trial; and (4) the presence and extent of prejudice to the defendant." *Id.* at 79 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

Although not determinative in every situation, "the most important question" is whether the delay prejudiced the defendant. *State v. Berry*, 141 S.W.3d 549, 568 (Tenn. 2004) (citing *State v. Simmons*, 54 S.W.3d 755, 760 (Tenn. 2001)). The most important factor in determining prejudice is whether the defendant's ability to prepare a defense was impaired. *Berry*, 141 S.W.3d at 568; *State v. Baker*, 614 S.W.2d 352, 356 (Tenn. 1981). Unless the delay is "presumptively prejudicial," it is not necessary for a court to consider the remaining factors under *Barker*. *Barker*, 407 U.S. at 530; *Doggett v. United States*, 505 U.S. 647, 651-53 n.1 (1992). "[A] delay must approach one year to trigger" analysis of the remaining three factors. *Berry*, 141 S.W.3d at 569 (quoting *State v. Utley*, 956 S.W.2d 489, 494 (Tenn. 1997)). That said, "the line of demarcation depends on the nature of the case[.]" *Utley*, 956 S.W.2d at 494. Moreover, the length of the delay, by itself, will not support a finding of a speedy trial violation. *Berry*, 141 S.W.3d at 569

Because the right to a speedy trial is a right recognized under both the federal and state constitutions and under our statute, we find this issue compelling to determine

whether relief is warranted under plain error. *See* U.S. CONST. amend. VI; TENN. CONST. art. 1 § 9; T.C.A. § 40-14-101.

Plain error relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *Rimmer*, 623 S.W.3d at 255-56 (citing *Martin*, 505 S.W.3d at 504).

First, the record clearly establishes that the length of the delay from the indictment to the trial exceeded one year. Specifically, from the date the indictment was handed down on July 5, 2018, to the date of the first day of trial, May 21, 2022, the length of the delay was three years and eight months. The length of the delay in this case was sufficient to trigger a speedy trial analysis. *Utley*, 956 S.W.2d at 494.

The record also establishes that Defendant Booker filed a motion for a speedy trial on February 28, 2020, which was heard and addressed on March 6, 2020. However, he did not assert his right to a speedy trial until over nineteen months after the indictment. We conclude that this factor weighs in Defendant Booker's favor, but only slightly.

At the hearing, Defendant Booker argued that the length of the delay was "approaching prejudice," and he moved for a trial to be set "as soon as practical." He did not, however, move to dismiss the indictment for failure to provide a speedy trial. *See* Tenn. R. Crim. P. 48(b). The record shows that the trial had been continued three times: the first continuance was by agreement of the parties because ballistics and gunshot residue testing had not been completed of which both sides had a vested interest; the second continuance occurred because the trial court was presiding over another criminal case and the medical examiner was unavailable; the third continuance occurred because the medical examiner was again unavailable. Defendant Booker did not object to the continuances. A trial date was then set by agreement for July 27-31, 2020.

While the record shows the reasons for the delay up to the March 6, 2020 hearing, nothing in the record indicates what led to the postponement of trial until May 21, 2022. However, on March 13, 2020, the Supreme Court declared a state of emergency for the Judicial Branch of Tennessee government in response to the COVID-19 pandemic and suspended all in-person court proceedings, including jury trials. *In Re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. Mar. 13, 2020) (Order). Ultimately, our courts remained under this state of emergency until June 8, 2023. *In re: COVID-19 Pandemic*, No. ADM2020-00428 (Tenn. June 8, 2023). Jury trials were, however, permitted during certain periods of the state of emergency. Defendant Booker's motion to alter the

- 28 -

conditions of his bail, filed on August 13, 2020, after the scheduled trial date, references the July 27-31, 2020 trial date having been postponed due to the COVID-19 pandemic.

On March 16, 2022, Defendant Booker filed his second motion for severance, which was heard the morning of the first day of trial, March 21, 2022. Defendant Booker did not assert the violation of a speedy trial as a claim for relief in that motion or in his motion for new trial. Defendant Booker makes no mention of the COVID-19 pandemic as a reason for the delay and in accordance with the plain error doctrine, we will not speculate regarding those reasons. As the State argued in its brief, the record is inadequate, and the second *Barker* factor does not weigh in favor of Defendant Booker. We note that a panel of this court has previously observed that "the large majority of courts in other jurisdictions that have addressed a defendant's claim of a violation of his constitutional right to a speedy trial based, in part, on pandemic-related delays have declined to attribute such delays to the State." *State v. Hodge*, No. E2022-00303-CCA-R3-CD, 2023 WL 5472212, at *10 (Tenn. Crim. App. Aug. 24, 2023) (citing *United States v. Keith*, 61 F.4th 839, 853 (10th Cir. 2023) (noting that "no circuit has yet published an opinion classifying delays under the second Barker factor," choosing to "treat COVID-19 as a truly neutral justification - not favoring either side," and concluding that "[t]he extenuating circumstances brought about by the pandemic prevented the government from trying [the defendant] in a speedy fashion")), *perm. app. denied* (Tenn. Feb. 13, 2024).

Additionally, the record does not demonstrate evidence of the most important *Barker* factor: prejudice. Defendant Booker alleges that the delay hampered his defense and resulted in a lengthy pretrial incarceration. He admits that there was no proof of prejudice at the March 6, 2020 hearing and he points to no witnesses or evidence he lost during that time. He contends instead that his defense was hampered because Ms. Diaz, Mr. Bullock, and Ms. Oden all claimed deficiencies in their memories regarding the shooting. Any such acknowledgment from the State's witnesses helped, not harmed Defendant Booker's defense. Indeed, the transcripts show that Defendant Booker capitalized on the three-year delay to expose shortcomings in the witnesses' recollection of the crimes. For instance, on cross-examination, both Ms. Diaz and Ms. Oden acknowledged that their memories of the events of the shooting were better closer to the time of the incident than at trial. Similarly, Mr. Bullock conceded on cross-examination that he could not recall the details of what he told the police but otherwise recalled the facts of the shooting.

Further, there is no demonstration in the record that the circumstances of Defendant Booker's pretrial incarceration were unusual or egregious. He alleges in his brief that he "remained incarcerated for the entire length of the delay in prosecution" and nothing more. As this court has noted, pretrial "anxiety and concern are 'always present to some extent, and thus absent some unusual showing [are] not likely to be determinative in [a]

defendant's favor.'" *State v. Hernandez*, No. M2016-02511-CCA-R3-CD, 2019 WL 2150171, at *40 (Tenn. Crim. App. May 15, 2019) (quoting 5 - Wayne Lafave, Criminal Procedure, § 18.2(e) (4th ed. 2017) (footnotes omitted)).

Because the record does not clearly establish what occurred in the trial court, there is no demonstration that an unequivocal rule of law was breached, or that Defendant Booker's speedy trial right was adversely affected. Defendant Booker is not entitled to relief.

## II. Denial of Motion to Sever

Defendant Booker asserts the trial court erred in denying his motion to sever his case from Defendant Craig's. He contends the trial court failed to consider proper factors as outlined in *State v. Harbison*, 539 S.W.3d 149, 159 (Tenn. 2018) in denying his severance motion, that the severance motion should have been granted "to preserve his right to a speedy trial," and that there was a disparity of evidence between himself and Defendant Craig. The State contends Defendant Booker has waived his severance issue on a speedy trial claim because he failed to raise it in his motion for new trial and is raising it for the first time on appeal. Alternatively, the State contends that Defendant Booker is not entitled to plain error relief because he cannot demonstrate that a clear and unequivocal rule of law was breached based on disparate evidence.

Our examination of record shows that in his two motions to sever, at the hearings on the two motions, and at the hearing on the motion for new trial, Defendant Booker argued for severance under Rule 14(c)(1) based on the State's intent to use Defendant Craig's statement to Ms. Oden that "homeboy" gave him the gun and shot the victim in the head. He has abandoned this claim on appeal, and it is waived.

Defendant Booker made a claim for severance to protect his speedy trial right in his first motion to sever but he did not renew it as a claim for relief in his second motion to sever nor did he raise it as an issue in his motion for new trial. This claim is waived. "[N]o issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived." Tenn. R. App. P. 3(e).

Defendant Booker's contention that he was prejudiced by the trial court's failure to consider the *Harbison* factors in denying his motion for severance is waived because he makes this argument for the first time on appeal. "In this jurisdiction, a party is bound by the ground asserted when making an objection. The party cannot assert a new or different theory to support the objection . . . in the appellate court." *State v. Adkisson*, 899 S.W.2d

626, 634-35 (Tenn. Crim. App. 1994). When a party asserts new grounds in the appellate court, the issue is treated as waived. *Id.* at 635. We therefore agree with the State that unless the record demonstrates plain error, Defendant Booker is entitled to no relief.

Like his speedy trial issue, Defendant Booker did not address the State's claim of waiver in a reply brief nor did he seek review for plain error. As previously stated, this court is under no obligation to review the issue. However, in our view, given the fact that this case involved serious charges including first degree premeditated murder, and involved a co-defendant and multiple witnesses, we find the circumstances compelling to consider this issue for plain error.

Joint trials promote judicial efficiency and "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987). Two or more defendants may be joined in part "if each of the defendants is charged with accountability for each offense included[.]" Tenn. R. Crim. P. 8(c)(1). The rule of joinder promotes judicial economy and efficiency by encouraging a single trial for offenses arising out of a single criminal episode. Tenn. R. Crim. P. 8, Advisory Comm. Cmts. The trial court shall grant a severance of defendants before trial if "the court finds a severance necessary to protect a defendant's right to a speedy trial or appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). Our supreme court has explained:

> There is no bright-line rule as to when a trial court should grant a defendant's request for severance. Courts consider the following factors, none of which are dispositive, when deciding whether to grant a severance: the number of defendants named in the indictment, the number of counts charged in the indictment, the complexity of the indictment, the estimated length of the trial, the disparities in the evidence offered against the defendants, the disparities in the degrees of involvement by the defendants in the charged offenses, possible conflicts between the defendants and their strategies, and prejudice from evidence admitted against a co-defendant(s) which is inadmissible or excluded as to another defendant.

*Harbison*, 539 S.W.3d at 159. The decision to grant or deny a motion for severance of defendants rests within the trial court's discretion, and we will not disturb the trial court's ruling absent an abuse of that discretion. *Id.*; *State v. Dotson*, 254 S.W.3d 378, 390 (Tenn. 2008). "Where a motion for severance has been denied, the test to be applied by this court in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[.]" *State v. Price*, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000).

First, the record establishes that Defendants were charged with the same three offenses in separate indictments. The trial court granted the State's motion to join the two cases because each defendant was "charged with accountability for each offense." *See* Tenn. R. Crim. P. 8(c)(1). Next, both of Defendant Booker's motions to sever were based on the State's use of Defendant Craig's statement to Ms. Oden. *See id.* The trial court required the State to remove all references to Defendant Booker in the statement. Tenn. R. Crim. P. 8(c)(1)(A). Specifically, the trial court ruled that there could be no evidence that Defendant Booker furnished Defendant Craig a gun or that Defendant Booker shot the victim in the head. The State provided a copy of Defendant Craig's redacted statement to both Defendants prior to trial and at trial, Ms. Oden made no mention of Defendant Booker procuring a gun for Defendant Craig or Defendant Booker shooting the victim in the head. Here, the trial court followed the dictates of Rule 8(c), and the resulting statement did not prejudice Defendant Booker. Therefore, no unequivocal rule of law was breached.

Next, Defendant Booker cannot succeed in his claim that the denial of his motion for severance resulted in a violation of the right to a speedy trial. As set out *supra*, we have concluded that because the record did not show the reasons for the delay or that he was prejudiced by the delay, Defendant Booker was not denied a speedy trial. Accordingly, the record does not establish that a substantial right was adversely affected.

Finally, Defendant Booker's complaint about the disparity of evidence is not borne out by the record. Defendant Booker cites Ms. Oden's testimony regarding Defendant Craig's confession that "he did something bad," how he hid things in the air vents of her residence, and that he shot the victim in the body. He also points to Ms. Diaz's testimony that she saw Defendant Craig pull out a gun and pull back the hammer and that she was aware of the $25 dispute between Defendant Craig and the victim. "A severance should not be granted simply because there is a '[d]isparity in the evidence against the defendants[.]'" *Harbison*, 539 S.W.3d at 162. The record does not show that Defendant Booker was unfairly prejudiced and that he was denied a fair determination of his guilt or innocence. A review of the jury instructions shows that the trial court instructed the jury that it was to "give separate consideration to each defendant" and that each defendant was "entitled to have his case decided on the evidence and the law which is applicable to that particular defendant." The trial court also instructed the jury that "[a]ny evidence which was limited to a particular defendant should not be considered by you as to any other defendant."

The verdicts revealed that the jury's careful assessment of the evidence against each Defendant resulted in Defendant Booker's conviction on the lesser charge of facilitation of first degree murder and that the jury understood and considered the relative positions of Defendants and followed the trial court's instructions to consider the guilt or innocence of each defendant individually. *See State v. Mickens*, 123 S.W.3d 355, 383-84 (Tenn. Crim.

App. 2003) (finding no prejudice where trial court instructed the jury to consider evidence that a co-defendant flashed gang signs during the testimony of a State's witness only as to that co-defendant). Thus, we conclude that no unequivocal rule of law was breached by the trial court's decision to deny Defendant Booker's motion for severance. He is not entitled to plain error relief.

### III. Sufficiency of the Evidence

Defendant Booker acknowledges that the jury could infer from the evidence that he drove Ms. Oden's blue Impala from the scene after the victim was shot multiple times. However, he claims the evidence was insufficient to support his conviction for facilitation of first degree murder because the State failed to prove that he assisted Defendant Craig in murdering the victim and that "there was no evidence [he] knew anything about the disagreement" between the victim and Defendant Craig. The State claims the evidence is sufficient to support the conviction. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this court is obliged to review that claim according to certain well-settled principles. The presumption of innocence is replaced with a presumption of guilt and the burden shifts to the defendant to show that the evidence is insufficient to support the conviction. *Reynolds*, 635 S.W.3d at 914; *Allison*, 618 S.W.3d at 33; *Jones*, 589 S.W.3d at 760. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34 (quoting *Jackson*, 443 U.S. at 319); *see also* Tenn. R. App. P. 13(e).

It is the jury's function to determine the credibility of the witnesses and the weight and value of the evidence. *Allison*, 618 S.W.3d at 34; *Jones*, 589 S.W.3d at 760. "[A]ll reasonable and legitimate inferences from the evidence must be drawn in favor of the prosecution and all countervailing evidence discarded." *Weems*, 619 S.W.3d at 221. The standard of review is the same whether the evidence is direct, circumstantial, or a combination of the two. *Dorantes*, 331 S.W.3d at 379. As previously stated, the primary issue for this court is whether any rational trier of fact could have found the accused guilty of every element beyond a reasonable doubt. *Allison*, 618 S.W.3d at 33-34; *Jackson*, 443 U.S. at 319; Tenn. R. App. P. 13(e).

First degree murder is defined as a "premeditated and intentional killing of another[.]" T.C.A. § 39-13-202(a)(1). Premeditation is "an act done after the exercise of reflection and judgment." *Id.* § 39-13-202(e). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility . . . , the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). Put another

way, "the State was required to prove the commission of a specified felony and the assistance the [defendant] gave to the person committing the specified felony." *State v. Dych*, 227 S.W.3d 21, 40 (Tenn. Crim. App. 2006).

Viewing the proof in the light most favorable to the State, the evidence at trial was sufficient for the jury to conclude that Defendant Booker knew Defendant Craig intended to kill the victim and that Defendant Booker furnished substantial assistance in the commission of the victim's murder.

According to Ms. Oden, Defendant Booker and Defendant Craig were "always together." On the night before the shooting, they were seen together by Ms. Oden in her home after she had returned from work, on the surveillance video at the Speedway convenience store near River Villa apartments just before the shooting, by Ms. Diaz when they arrived at her apartment, and again after the shooting by Ms. Oden. In terms of Defendant Booker's knowing Defendant Craig's intent, there was proof of a motive for the killing. Defendant Craig owed the victim $25. Because Ms. Diaz was aware of the dispute, she warned the victim that Defendant Craig and Defendant Booker were in her apartment and tried to persuade him to leave and return after they left. Earlier, throughout the day, Ms. Diaz observed Defendant Craig driving back and forth in the River Villa parking lot. Despite Ms. Diaz's warning, the victim entered Ms. Diaz's apartment, and once inside, Defendant Craig wielded a gun and pulled back the hammer before he and the victim stepped outside. Defendant Booker was with Defendant Craig in the apartment and followed Defendant Craig and the victim outside.

Mr. Bullock testified that the driver and the passenger were each armed with a gun. After the first series of shots, Mr. Bullock testified that the driver stepped out of the Impala, and returned to the other side of the van where the initial gunshots were heard. Mr. Bullock then heard another gunshot. The driver, armed with a gun, returned to the blue Impala and drove out of the apartment complex. Spent cartridge cases from two different firearms, a .45 caliber and a 9mm caliber were found at the scene of the shooting. The expert testified that a .45 caliber bullet could not be fired from a 9mm caliber bullet and vice versa. Ms. Oden testified that she owned a .45 caliber semi-automatic handgun which she found Defendant Craig had hidden in one of the air vents in her home when the police arrived.

Although Mr. Bullock denied that Defendant Booker was the driver, his description of the driver and the passenger was consistent with the physical identification of Defendant Craig and Defendant Booker. Mr. Bullock also acknowledged that he and Defendant Booker were related. By their verdict, the jury resolved Mr. Bullock's description of the driver in favor of convicting Defendant Booker but found his culpability to be less than Defendant Craig's.

Based on our review, there was sufficient circumstantial evidence presented at trial with which a jury could determine beyond a reasonable doubt that Defendant Booker was guilty of facilitation of first degree murder.  He is not entitled to relief.

## CONCLUSION

For the forgoing reasons, the judgments of the trial court are affirmed.


_____
JILL BARTEE AYERS, JUDGE